RECORD NO. 12-2503

In The

# United States Court of Appeals

### For The Fourth Circuit

## SEAN P. SMITH,

*Plaintiff – Appellant*,

**v.**

## PETER S. GILCHRIST, III,

*Defendant – Appellee*.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
AT CHARLOTTE

———————————

## REPLY BRIEF OF APPELLANT

———————————

Matthew R. Arnold
ARNOLD & SMITH, PLLC
200 North McDowell Street
Charlotte, North Carolina 28204
(704) 370-2828

*Counsel for Appellant*

**THE LEX GROUP** ♦ 1108 East Main Street ♦ Suite 1400 ♦ Richmond, VA 23219
(804) 644-4419 ♦ (800) 856-4419 ♦ Fax: (804) 644-3660 ♦ www.thelexgroup.com

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................. iii

ARGUMENT ....................................................................................1

I.     IN FRAMING THE APPELLANT'S FREE SPEECH RIGHT, THE DISTRICT COURT IMPROPERLY SHIFTED THE FOCUS OF THE ANALYSIS FROM THE APPELLEE TO THE APPELLANT AND FRAMED THE RIGHT IN A MANNER THAT WAS PREJUDICIAL TO THE APELLANT'S CASE ........................................................2

      A.     The manner in which the District Court framed the Appellant's right improperly shifted the focus of the qualified immunity analysis from the Appellee to the Appellant ........................................................2

      B.     The manner in which the District Court framed the Appellant's free speech right was prejudicial to the Appellant's case ........................................................5

II.     THE DISTRICT COURT'S FAILURE TO APPLY THE CORRECT STANDARD OF REVIEW AT THE SUMMARY JUDGMENT STAGE WAS AN ERROR THAT COMPELS REVERSAL ........................................................7

      A.     When ruling on the Appellee's summary judgment motion, the District Court did not view the evidence and any inferences from the evidence in a light most favorable to the nonmoving party ........................................................7

      B.     The Appellee appears to concede that the District Court applied an incorrect standard in its order granting his motion for summary judgment........................................................10

III.   THE APPELLANT'S FREE SPEECH RIGHT WAS CLEARLY ESTABLISED AT THE TIME OF HIS TERMINATION SUCH THAT AN OBJECTIVELY REASONABLE ELECTED DISTRICT ATTORNEY WOULD HAVE FULLY UNDERSTOOD THE CONTOURS OF THE APPELLANT'S RIGHTS OR THE COMPLEXITY OF THE LEGAL QUESTIONS INVOLVED ....................................................11

    A.   Contrary to the Appellee's allegation, the Appellant addressed at length the second prong of the qualified immunity analysis in his opening brief .....................................11

    B.   The Appellant addressed points made in the District Court's order regarding the Appellee's subjective mindset ..................................................................................12

    C.   An objectively reasonable District Attorney would be expected to fully understand the contours of Appellant's rights or the complexity of the legal questions involved, unlike the defendant in *Bland v. Roberts* ...................................14

IV.   PUBLIC EMPLOYEES ARE NOT REQUIRED TO GIVE A "HEADS UP" TO THEIR EMPLOYERS BEFORE EXERCISING THEIR RIGHT TO FREEDOM OF SPEECH ON MATTERS OF PUBLIC CONCERN ..........................................17

V.   SET IN THEIR PROPER CONTEXT, THE STATEMENTS ATTRIBUTED TO APPELLANT IN THE DISTRICT COURT'S ORDER WERE MERE ALLEGATIONS MADE BY A WITNESS AND THE APPELLEE ..........................................22

CONCLUSION .............................................................................................23

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Anderson v. Liberty Lobby, Inc.*,
 477 U.S. 242 (1986)..................................................................7, 8

*Bailey v. Kennedy*,
 349 F.3d 731 (4th Cir. 2003) ...........................................2

*Bland v. Roberts*,
 857 F. Supp. 2d 599 (E.D. Va. 2012) ......................................14, 15

*Brown v. Gilmore*,
 278 F.3d 362 (4th Cir. 2002) ...........................................2

*Edwards v. City of Goldsboro*,
 178 F.3d 231 (4th Cir. 1999) ...........................................3

*Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*,
 475 U.S. 574 (1986)..................................................................7

*McVey v. Stacy*,
 157 F.3d 271 (1998) ...........................................2, 3

*Pearson v. Callahan*,
 555 U.S. 223 (2009)..................................................................1

## CONSTITUTIONAL PROVISIONS

N.C. Const. art. I, § 14..................................................................24

U.S. Const. amend. I..................................................................15, 23

## STATUTE

42 U.S.C. § 1983..................................................................24

## ARGUMENT

The Appellant was an Assistant District Attorney in an office headed by the elected District Attorney, the Appellee. After granting an interview to a local television news outlet, the Appellee terminated the Appellant's employment. The Appellant contends that the termination was premised upon statements he made in the interview and constituted a violation of his free speech rights. The Appellee has alleged the Appellant's insubordinate attitude and refusal to answer a question were the cause of his dismissal, and that even if the Appellee violated the Appellant's free speech rights, the right at issue was not clearly established at the time of the violation, and the Appellee is therefore immune from civil damages.

The District Court premised its grant of summary judgment on the defense of qualified immunity. The defense of qualified immunity is subject to a two-pronged analysis. A governmental official will be granted immunity unless (1) "the facts that a plaintiff has alleged make out a violation of a constitutional right[,]" and (2) "the right at issue was 'clearly established' at the time of [the] alleged misconduct." *Pearson v. Callahan*, 555 U.S. at 232 (2009). In determining whether the right at issue was clearly established at the time of the alleged misconduct, a court must decide "'whether the right was clearly established… such that it would be clear to an objectively reasonable officer that his conduct violated

1

that right.'" *Bailey v. Kennedy*, 349 F.3d 731, 739 (4th Cir. 2003) (quoting *Brown v. Gilmore*, 278 F.3d 362, 367 (4th Cir. 2002)).

The District Court assumed that a violation of a constitutional right occurred, satisfying the first prong of the qualified immunity analysis. The District Court premised its dismissal of this action on the notion that the Appellant's free speech right was not clearly established at the time of the Appellee's alleged misconduct, such that it would be clear to an objectively reasonable officer that his conduct violated that right.'" *Bailey*, 349 at 739. In the District Court's view, the Appellant failed to satisfy the second prong of the qualified immunity analysis. The Appellee was therefore subject to the protection of qualified immunity.

I.   **IN FRAMING THE APPELLANT'S FREE SPEECH RIGHT, THE DISTRICT COURT IMPROPERLY SHIFTED THE FOCUS OF THE ANALYSIS FROM THE APPELLEE TO THE APPELLANT AND FRAMED THE RIGHT IN A MANNER THAT WAS PREJUDICIAL TO THE APELLANT'S CASE.**

   A.   **The manner in which the District Court framed the Appellant's right improperly shifted the focus of the qualified immunity analysis from the Appellee to the Appellant.**

The second prong of the qualified immunity analysis requires a court to consider whether the Appellant's free speech right was clearly established at the time of the Appellee's alleged misconduct, such that a reasonable government official would have known of that right. *McVey v. Stacy*, 157 F.3d 271, 278 (1998). The court considers whether a reasonable person in the official's position would

have known that his conduct would violate the right, balancing the Appellant's interest in the speech at issue against the public's interest in the efficient functioning of the District Attorney's office. *Id*. at 278.

In order to balance the free speech right against the public's interest in the efficient functioning of the District Attorney's office, the court must set out, or frame, what the Appellant's free speech right was. The manner in which the District Court framed the Appellant's free speech right turned the second prong of the qualified immunity analysis on its head.

As the Appellee writes in his brief, "[t]o determine whether Appellant's right was clearly established at the time of termination, the Court essentially stands in the shoes of Appellee, who was placed in the position of balancing Appellant's interest in the speech at issue against the public's interest in the efficient functioning of the District Attorney's office." *Id*. (Resp.Br. 18.)

The qualified immunity analysis, as the Appellee points out, asks whether "an objectively reasonable elected official in *Appellee's* position would fully understand the contours of Appellant's rights or the complexity of the legal questions involved." *Id*. (Emphasis added) It asks "whether a reasonable person in the official's position would have known that his conduct would violate that right." *Edwards*, 178 F.3d at 251. (Resp.Br. 17.)

As the Appellee's brief shows, the focus of the qualified immunity analysis is on what the elected official knew or would be expected to know, not upon what the Appellant would be expected to know. The District Court framed the right as being "the right of an Assistant District Attorney running for political office to pay money, attend a driving class, and criticize the value of the class as a matter of public concern, where that class is a program directly related to the efficient operation of the District Attorney's Office, without being terminated by the District Attorney." (Resp.Br. 15.)

The second prong of the qualified immunity analysis, however, asks what, if anything, an objectively reasonable elected official may legally do when an employee exercises the right of free speech. Termination is an option, but does that option violate the employee's rights? The court searches the mind of the objectively reasonable elected official, and stands in his or her shoes.

The District Court framed the Appellant's right in a manner that placed the inquiry squarely in the Appellant's shoes, and in the Appellant's mind. The District Court's framing of the Appellant's right appears to ask: Can an Assistant District Attorney say these things and get away with it? He must know the answer is no!

The District Court improperly framed the Appellant's right in a manner that prevented it from conducting a fair balancing of the second prong of the qualified immunity analysis. Whereas the focus should have been upon the objectively

reasonable elected official, in its framing of the Appellant's right, the District Court shifted the focus of the inquiry in the wrong direction: at the Appellant.

**B.     The manner in which the District Court framed the Appellant's free speech right was prejudicial to the Appellant's case.**

The Appellee writes in his brief that the "Appellant strips away all specificity, and ignores the second prong of the qualified immunity analysis, by contending that the right at issue is limited to Appellant's right to speak to the press on a matter of public concern without being terminated." (Resp.Br. 15-16.)

The Appellant does not seek to strip away all specificity, as the Appellee alleges. Actually, the manner in which the Appellee sets out the Appellant's argument – that the Appellant had a right to speak to the press on a matter of public concern without being terminated – is quite specific.

It is true, however, that the Appellant's free speech right could be framed in any number of ways. The District Court improperly framed the Appellant's right in a manner that effectively resolved the case in the Appellee's favor.

The right as framed by the District Court is a negative right ("without being terminated"). The assumption is termination or the District Attorney's right to terminate. As a positive right, it might be framed as: "An Assistant District Attorney running for political office may pay money, attend a driving class, and criticize the value of the class as a matter of public concern, where that class is a

program directly related to the efficient operation of the District Attorney's Office, without being terminated by the District Attorney." *See* J.A. at 335.

The District Court conflated the matter of public concern into a series of steps ("running for political office" "pay money" "attend a driving class" "criticize the value of the class" "the class is a program directly related…") adopting the Appellee's contention that the class was "a program directly related to the efficient operation of the District Attorney's office[.]" J.A. at 335 (Resp.Br. 15.)

The Appellant does not seek to strip away specificity in framing the right. He merely points out what the District Court assumed was true: The Appellant's statements in the FOX Charlotte interview were a substantial factor in the Appellee's decision to terminate his employment. The statements – as the Appellee has conceded and as the District Court was obliged to assume – regarded a matter of public concern. Framed in this case, did an Assistant District Attorney have the right to speak to the public regarding an issue that the District Attorney considered to be a matter of public concern, without being fired by the very same District Attorney?

Put differently: Can a District Attorney terminate an Assistant District Attorney for public statements made in the context of a judicial campaign regarding a matter that the District Attorney admits is of public concern, without

violating the Assistant District Attorney's free speech rights? The Appellant respectfully submits that the answer is no.

## II.   THE DISTRICT COURT'S FAILURE TO APPLY THE CORRECT STANDARD OF REVIEW AT THE SUMMARY JUDGMENT STAGE WAS AN ERROR THAT COMPELS REVERSAL.

### A.   When ruling on the Appellee's summary judgment motion, the District Court did not view the evidence and any inferences from the evidence in a light most favorable to the nonmoving party.

The Appellee contends that the "Appellant attempts to create an issue that does not exist in the District Court's grant of summary judgment" by pointing out that the District Court assumed that the Appellant' FOX Charlotte interview was a substantial factor in his decision to terminate the Appellant's employment. (Resp.Br. 10.)

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Any permissible inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986). The function of the judge at the summary judgment stage is not to determine the truth of a matter or to weigh credibility but to determine whether there is any genuine issue of fact that can only

properly be resolved by a finder of fact because it could reasonably be resolved in favor of either party. *Id*. at 250.

The Appellee appears to argue that because the District Court viewed one inference in the Appellant's favor, it viewed them all in that light. This was not the case.

The District Court appeared to determine that there were genuine issues of fact that could only properly be resolved by a finder of fact, but then it improperly resolved those issues in the Appellee's favor and granted his motion for summary judgment.

One genuine issue of material fact, for instance, is whether the Appellant criticized a program that directly impacted the office for which he worked. The Appellee alleges in his brief that "[t]he plaintiff's interview criticized a program which directly impacted the office for which he worked[.]" (Resp.Br. 21.) However, as the Appellee writes on the previous page of his brief, the Appellant contended that "he spoke only of the course, and the course is not administered by the District Attorney's office." (Resp.Br. 20.) The Appellee then goes on to write that the Appellant's "contention fails to recognize the impact of the course on the District Courts of Mecklenburg County and the Office of the District Attorney." *Id*.

By his own words, the Appellee appears to understand the distinction between criticizing a driving course offered by a third-party vendor and criticizing a program

in which drivers could take a defensive driving course offered by one or more of such vendors as an alternative to appearing in court. The Appellee admitted in his deposition that the Appellant's statements did not impugn the authority or credibility of the District Attorney's office at all; (See J.A. at 100) that the Appellee helped create the defensive driving program; and that he was close to the creation and implementation of the program. J.A. at 92-93. The Appellee also admitted that the defensive driving program was not a District Attorney office program, rather that the District Attorney's office had become a player in the policy of offering to ticketed drivers the option of taking a defensive driving curse in lieu of a court appearance. J.A. at 122-124. This arrangement featured a number of parties – ticketed drivers, the District Attorney's office, the judges who oversaw the district courts and who consented the program's creation and continuation, the nonprofit organization that offered the courses, and administrative staff employed by the State who administered the traffic tickets and receipt of court costs from the nonprofit.

It was improper for the District Court to adopt the Appellee's position that the defensive driving course constituted "a program directly related to the efficient operation of the District Attorney's Office." J.A. at 335

In doing so, the District Court resolved, in the Appellee's favor, a material fact that is in dispute, in disregard of its obligation to resolve all factual inferences in favor of the nonmoving party at the summary judgment stage.

**B.    The Appellee appears to concede that the District Court applied an incorrect standard in its order granting his motion for summary judgment.**

In his brief, the Appellee appears to concede that the District Court did not apply the correct standard. Instead of resolving *all* inferences in favor of the nonmoving party, it reviewed "the evidence that spoke to… the balance between Appellant's interest in the speech at issue and the Appellee's interest in the efficient functioning of his office." (Resp.Br. 14-15.)

This "review" relied to a great extent on Menser's – and to a lesser extent the Appellee's – deposition testimony. The Appellee writes of an "intervening act" – the Appellant's "refusal to answer legitimate questions posed by his employer; such refusal exhibiting a disrespectful and insubordinate attitude." (Resp.Br. 14.) After setting out a termination scene in which the Appellee purposes to fire the Appellant for "refusing to answer a question," the Appellee writes that the District Court assumed that the Fox Charlotte interview was a substantial factor in the Appellee's decision to fire the Appellant, "[d]espite the foregoing," or the Appellee's proffered "insubordination" argument. *Id*.

The District Court did nothing in spite of the Appellee's argument. The District Court actually adopted the Appellee's and Menser's statements – the very statements quoted in Appellee's brief – in its order. J.A. at 339-340. If one overweighs their statements and credibility against the contrary contentions and

10

credibility of the Appellant, one reaches the result the District Court reached in its order. It was not the job of the District Court, however, to weigh the evidence and the credibility of witnesses at the summary judgment stage. Those functions are reserved for a jury

The District Court may have written that it assumed that the Appellant's FOX Charlotte interview was a substantial factor in the Appellee's decision to terminate the Appellant's employment, but it did not treat the Appellant's case as if it had done so in its order. Instead, despite its assumption, the District Court adopted the Appellee's arguments regarding the Appellant's conduct and refusal to answer a question into its analysis of whether the Appellant's free speech right was clearly established at the time of the free speech violation.

## III. THE APPELLANT'S FREE SPEECH RIGHT WAS CLEARLY ESTABLISED AT THE TIME OF HIS TERMINATION SUCH THAT AN OBJECTIVELY REASONABLE ELECTED DISTRICT ATTORNEY WOULD HAVE FULLY UNDERSTOOD THE CONTOURS OF THE APPELLANT'S RIGHTS OR THE COMPLEXITY OF THE LEGAL QUESTIONS INVOLVED.

### A. Contrary to the Appellee's allegation, the Appellant addressed at length the second prong of the qualified immunity analysis in his opening brief.

The Appellee's allegation that the Appellant "repeatedly restricts the question to an analysis of what Appellee subjectively thought" (Resp.Br. 16) is merely a smokescreen designed to buffer the impact of its wholly meritless contention that the Appellant "ignore[d] the required balancing." *Id*. The Appellee

11

alleges that the Appellant "ignores the second prong of the qualified immunity analysis, by contending that the right at issue is limited to Appellant's right to speak to the press on a matter of public concern without being terminated." (Resp.Br. 15-16.)

The Appellant spent several pages in his brief conducting a balancing of his right against the Appellee's interest in the efficient operation of his office. The Appellant points the court and the Appellee to the section of his brief titled: *IV. C. Prong 2: The Plaintiff's right was clearly established at the time of the Defendant's misconduct*. The arguments that follow cover nine-and-a-half pages of the Appellant's opening brief. (See Op.Br. 30-40.)

The Appellant did not ignore the second prong of the qualified immunity analysis and did not ignore "the required balancing[,]" as Appellee alleged. (Resp.Br. 16.) The Appellant believes and urges this Court to accept his argument that it would be clear to an objectively reasonable elected District Attorney that his conduct in terminating an Assistant District Attorney's employment for statements made in a news interview about a defensive driving course violated his free speech rights.

**B.    The Appellant addressed points made in the District Court's order regarding the Appellee's subjective mindset.**

Regarding the Appellee's allegation that "Appellant repeatedly restricts the question to an analysis of what Appellee subjectively thought," the Appellee points

12

out in his own brief that the District Court analyzed "how that [qualified immunity second prong] balance would be perceived by Appellee at the time of the alleged misconduct." (Resp.Br. 15.)

While the standard under the second prong of the qualified immunity analysis is an objective one, the District Court in its order dismissing the case made repeated references to the Appellee's subjective mindset, namely what his thoughts were regarding the efficacy of the program he created to offload traffic ticket cases to third-party vendors. J.A. at 339-340. The Appellant felt compelled to address the District Court's treatment "of what Appellee subjectively thought" in order to address the deficiencies in the District Court's order thoroughly.

In any case, simply because the standard is objective does not mean the Appellee's statements, as quoted in Appellee's brief, are irrelevant. (Resp.Br. 17.) The Appellee is an example of the official in question – a District Attorney – and having served over three decades in that capacity would, by logic, render him to be a very representative of what a District Attorney would be, and would reasonably be expected to know.

The Appellee miscasts what he calls the Appellant's repeated restricting of the question of whether a reasonable person in the official's position would have known that his conduct would violate the Appellant's right to an analysis of what Appellee subjectively thought. As Appellee points out in his own brief, "[t]o

13

determine whether Appellant's right was clearly established at the time of termination, the Court essentially stands in the shoes of Appellee, who was placed in the position of balancing Appellant's interest in the speech at issue against the public's interest in the efficient functioning of the District Attorney's office." (Resp.Br. 18.)

The Appellant urges the Court to find and hold that an objectively reasonable District Attorney, balancing the Appellant's free speech right against the public's interest in the efficient functioning of the District Attorney's office, would know that terminating an Assistant District Attorney for statements made in a judicial campaign regarding a third-party vendor that happens to be associated with a program utilized by ticketed drivers to avoid court appearances, would violate the Assistant District Attorney's free speech rights.

**C.     An objectively reasonable District Attorney would be expected to fully understand the contours of Appellant's rights or the complexity of the legal questions involved, unlike the defendant in *Bland v. Roberts*.**

The District Court's order hinged on balancing the Appellant's free speech right against the public's interest in the efficient operation of the office to which the Appellee had been elected. Both the District Court in its order and the Appellee in his brief reference *Bland v. Roberts*, 857 F. Supp. 2d 599, 608 (E.D. Va. 2012), and the Appellee even goes so far as to say that *Bland* means "an objectively reasonable elected official in Appellee's position would [not] fully understand the

14

contours of Appellant's rights or the complexity of the legal questions involved." (Resp.Br. 18.)

The Appellee distorts the meaning of *Bland*, however, by equating himself with the elected official in *Bland* and concluding that both were "objectively reasonable." Whether a reasonable elected District Attorney would fully understand the contours of the Appellant's First Amendment rights is a far different question from whether a sheriff, as in *Bland*, would understand. It is instructive to note that the sheriff in *Bland*, presumably lacking the refined legal education and years of experience analyzing complex legal problems enjoyed by the Appellee, claimed to possess a level of familiarity with the First Amendment rights of his employees that the Appellee claims he lacked.

In his brief, the Appellee quotes a single exchange from a lengthy portion of his deposition in which he agreed that the Appellant's rights were protected by his First Amendment right to free speech. (Resp. Br. 17.) The Appellee asks the Court to ignore this admission, appearing to argue that the questioning "barely touch[ed] the convoluted arena of the law in which the [Defendant] and his discharged employee[] have opposed one another." *Bland*, 857 F. Supp. 2d 599, 608 (E.D. Va. 2012).

The Appellee ignores, however, a long series of questions and answers that, taken together, form a comprehensive, nuanced picture of the right of free speech

as it applies to Assistant District Attorneys employed in District Attorneys offices. The questioning begins on Page 13 of Appellee's deposition, with the question: "In your 36 years as the elected district attorney of Mecklenburg County, what was your day-to-day role in that office?" J.A. at 55. The questioning does not conclude until the Appellee's admission that the Appellant's statements were protected speech. J.A. at 63. The discussion includes decision-making authority in the office (J.A. at 58), office policy implementation (J.A. at 58-59), how policies were communicated to Assistant District Attorneys (J.A. at 59), employee manuals and written office policies (J.A. at 59-60), who made the decision to terminate the Appellant's employment and why (J.A. at 60), an exploration of the Appellee's contention regarding the Appellant's refusal to answer a question posed by Menser (J.A. at 61-62), whether there were any other instances of alleged insubordination (J.A. at 62), and office policy regarding personnel files. The Appellee was asked again, later in the deposition, whether the Appellant was fired for his statements in the FOX interview. J.A. at 87-88. The Appellee answered that he had not been fired for those statements, and admitted that if he had, that would have violated his right to free speech. J.A. at 88. In light of The Appellee's admission that terminating Appellant for giving the interview " as [he] understands it to have been given' would have constituted a violation of his free speech rights, this case

collapses in to a factual dispute about the motivations for defendant terminating plaintiffs employment.  This factual dispute should be resolved by a jury.

The Appellant urges this Court to find that an objectively reasonable elected official in Appellee's position would fully understand the contours of Appellant's rights and the complexity of the legal questions involved. To put it plainly, it is the job of a lawyer – the job of an objectively reasonable elected District Attorney – to understand the contours of the rights of employees in the District Attorney's office.

## IV.  PUBLIC EMPLOYEES ARE NOT REQUIRED TO GIVE A "HEADS UP" TO THEIR EMPLOYERS BEFORE EXERCISING THEIR RIGHT TO FREEDOM OF SPEECH ON MATTERS OF PUBLIC CONCERN.

The Appellee emphasizes in his brief that the Appellant took the defensive driving course to educate himself about programs related to District Court cases (Resp.Br. 19), appearing to contend that the Appellant could only have had countenanced criticism of the District Attorney's office in mind when doing so. This contention smacks of paranoia.

District Courts are worlds unto their own, with many players, and the District Attorney and his or her staff is but one, lorded over by the law and by judges. The Appellant took the defensive driving course in furtherance of his candidacy to become one of those judges. His visit to the defensive driving class had nothing to do with the District Attorney's office. It is the business of a District Court judge to investigate the status of cases that fall within the District Court's

jurisdiction. More importantly, in a free and open society, any citizen might investigate the handling of public matters by public officers, and may freely and publicly speak on such matters.

The Appellee appears to have thought otherwise. He wanted to get to the bottom of why the Appellant said what he said and why the Appellant did not warn him before giving the interview. The Appellee did not appear to be as concerned with *what* the Appellant said as he was with *who* spoke to the media and why he – the Appellee – was not consulted first.

The Appellee's statements in his deposition appear to show that he had never even watched the interview. J.A. at 101-103. The Appellee's and Menser's testimony regarding their actions after the Appellant gave the interview has them preoccupied with the issue – meeting to speak about the interview and identify the interviewee, responding to a phone call from a reporter about the interview, meeting twice with the Appellant and questioning him at length. J.A. at 115-116; J.A. at 119-129; J.A. at 147-155. The Appellee's apparent hyper-reaction to a news interview given by an Assistant District Attorney belies the Appellee's erstwhile contention that Assistant District Attorneys were free to speak to the media. The Appellant submits that the Appellee's actions and his contentions in his brief show he was enraged at the Appellant for speaking out *at all* and perceived any comments as touching on issues relating to the District Attorney's office merely by

18

virtue of the Appellant's status as an Assistant District Attorney. The Appellee saw the Appellant's interview as a usurpation of his power and acted swiftly to terminate the Appellant's employment.

The Appellee's contentions in his brief illustrate the level of control he expected to exercise over the speech of his employees. The Appellee writes, for instance, that "[w]hen asked if [the Appellant] considered informing his employer after the interview so his employer would have a heads up before the media started calling, Appellant responded that he thought about doing that and decided against it." (Resp.Br. 13.)

The Appellee assumes he was owed a "heads up" or that a "heads up had anything to do with the Appellant's free speech rights. The Appellee describes "an obvious sequence of events that anyone should anticipate would put Appellee in the position of having to respond." *Id*. The Appellee writes that Appellant was "asked if he considered informing his employer prior to giving the interview[.]" According to the Appellee, his failure to do so, combining with other "conduct, and Appellant's failure to answer the legitimate questions of his employer, was the cause of Appellant's termination." *Id*.

The Appellee appears to create an affirmative duty for Assistant District Attorneys to give the District Attorney a heads up before and after speaking to the press on matters of public concern, especially if a reporter is likely to call the

19

District Attorney for comment on the matter. If Assistant District Attorneys have a duty to give their employers a "heads up" before and after exercising their free speech rights, how far does the duty extend?

In his brief, the Appellee suggests that the duty to give a heads up before speaking about a matter publicly extends to issues that impact the dockets of the District Courts. As the Appellee notes, in the FOX Charlotte interview the Appellant "spoke only of the driving course, and the course is not administered by the District Attorney's office." (Resp.Br. 20.) The course, however, impacts the District Court's docket, which "impacts the Office of the District Attorney." *Id*. As the Appellee appears to see it, an Assistant District Attorney would face termination for speaking on any issue that "impacts the Office of the District Attorney[,]" and then explains that "it goes without saying that… any impact on the dockets of the District Court impacts the Office of the District Attorney." *Id*.

The General Assembly's passage of a law making it illegal to speak on one's cellular telephone device while operating a motor vehicle would impact the dockets of the District Courts if jurisdiction over the matter was conferred to the District Courts. If the ban was enforced stringently, it would greatly increase the number of prosecutions – and thereby impact the docket – in the District Courts. If an Assistant District Attorney running for judicial office spoke out in a campaign interview in favor of the ban on cell phone use while driving, would he face

20

termination? Could he be required by his employer to speak out against the ban, since that would lessen the potential strain on the court docket, or else not speak at all? What happens if the Assistant District Attorney does give his employer a heads up before publicly airing his opinions, as the Appellee desires? Can the employer preclude the speech? Can the employer justly terminate the Assistant District Attorney if the Assistant District Attorney speaks out in spite of the District Attorney's warnings?

The right of free speech is not hitched to a requirement to give a "heads up" to a public figure who might later be paid a phone call by a reporter seeking comment on a matter. The Appellee was the District Attorney of Mecklenburg County, a large judicial district that includes the City of Charlotte. As District Attorney, the Appellee appeared at hundreds – perhaps thousands – of public events in and around Charlotte, was oftentimes the focus of media scrutiny – particularly when high-profile cases were tried – was called, emailed, visited, written to by any manner of reporters seeking comment on issues. The free speech rights of Assistant District Attorneys working in the office to which he had been elected were not contingent upon whether and under what circumstances he desired to speak to the media.

## V.  SET IN THEIR PROPER CONTEXT, THE STATEMENTS ATTRIBUTED TO APPELLANT IN THE DISTRICT COURT'S ORDER WERE MERE ALLEGATIONS MADE BY A WITNESS AND THE APPELLEE.

In its order, the District Court referenced the Appellant's "criticism" of the driving school arrangement. J.A. at 340. Many of the statements that underlie the District Court's balancing of interests – and which appear to tip the balance to its finding that the Appellant's speech "interfered with the efficient operation of the District Attorney's Office[,]" – came  not from the Appellant himself but were hearsay statements made by Menser and the Appellee regarding what they allege the Appellant said. (Resp.Br. 14.)

In his brief, the Appellee appears to present as fact allegations made by Menser and the Appellee regarding the statements of a third party – the Appellant – in a meeting. The Appellee writes that "when Appellant was asked if he had considered talking to his employer prior to giving he interview, Appellant responded that he had considered it, but didn't think they would like it, so decided against it." (Resp.Br. 13.) The Appellee makes no immediate citation to this statement attributed to the Appellant. In viewing the evidence contained in the joint appendix, the only reference to such statements are found in Menser's and the Appellee's answers to deposition questions and in the Appellee's arguments in pleadings. These same answers are cited in the District Court's order. J.A. at 339-340.

22

It is necessary to place statements that the Appellee has attributed to the Appellant in their proper context. According to the Appellee and an interested witness, the Appellant made certain statements in a meeting. The Appellant has not confirmed making these statements, and his recitation of the facts – set out in a sworn affidavit – contain no reference to such statements.

In a similar vein, the Appellee appears to present as fact another allegation made by Menser during his deposition. As the Appellee writes, Menser testified that the Appellant told him that he had issues with the driving school and the District's Attorney's recommending people to go to the driving school. (Resp.Br. 19.) The Appellee does not explain that this was Menser's hearsay statement regarding the comments of a third party – the Appellant – in a meeting. The Appellee merely prefaces Menser's quote by writing that "Appellant explained…" The Appellant respectfully urges the Court not to be misled by the presentation of a statement that was attributed to the Appellant by a witness.

## CONCLUSION

The Appellant respectfully submits that the evidence of record establishes that his news interview regarding a matter of public concern was a substantial factor in the Appellee's decision to terminate his employment. This termination constituted a violation of the Appellant's rights under the First Amendment to the United States Constitution. The Appellant's free speech rights were clearly

23

established at the time of the Constitutional violation. The Appellee is not entitled to qualified immunity from the Appellant's claims under 42 U.S.C. § 1983, under the N.C. Const. Art. I, § 14, and under any other theory of relief set out in the Appellant's complaint.

Respectfully submitted this the 25th day of April, 2013.

/s/ Matthew R. Arnold
Matthew R. Arnold
Counsel for Appellant
N.C. Bar No. 31370
Arnold & Smith, PLLC
200 North McDowell Street
Charlotte, North Carolina  28204
Telephone:  704.370.2828
Facsimile:    704.370.2202
Electronic Mail: mra@arnoldsmithlaw.com

## CERTIFICATE OF COMPLIANCE

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

[ X ] this brief contains [*5,562*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

[     ] this brief uses a monospaced typeface and contains [*state the number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

[ X ] this brief has been prepared in a proportionally spaced typeface using [*Microsoft Word 2007*] in [*14pt Times New Roman*]; *or*

[     ] this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].

Dated: <u>April 25, 2013</u>               <u>/s/ Matthew R. Arnold</u>
                                        *Counsel for Appellant*

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on this 25th day of April, 2013, I caused this Reply Brief of Appellant to be filed electronically with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

Grady L. Balentine, Jr.
NC DEPARTMENT OF JUSTICE
Post Office Box 629
Raleigh, North Carolina  27602
(919) 716-6800
gbalentine@ncdoj.gov

*Counsel for Appellee*

I further certify that on this 25th day of April, 2013, I caused the required copies of the Reply Brief of Appellant to be hand filed with the Clerk of the Court.

/s/ Matthew R. Arnold
*Counsel for Appellant*